FRANK HOLACEK v. T. M. SINCLAIR & Co., Limited, Appellant.

**Master and servant:** DEFECTIVE MACHINERY: PRIOR COMPLAINT: ASSUMPTION OF RISK. Under the allegations of an answer alleging that owing to plaintiff's knowledge of the defective apparatus with which he was at work he assumed the risk thereof, it was competent for him to show a prior complaint and assurance of the foreman that the defect complained of had been remedied; as it was not incumbent upon him to make an independent investigation to determine whether the same had been remedied; and the question of whether the defect had been adequately remedied was for the jury.

**Same:** NEGLIGENCE: EVIDENCE. In this action for injuries sustained while operating a blood press in defendant's plant, the evidence is held insufficient to support a finding that the cause of the accident was the defect complained of by plaintiff, but was rather the fault of a coemployee for whose negligence the defendant was not liable.

*Appeal from Cedar Rapids Superior Court.*—HON. JAMES H. ROTHROCK, Judge.

FRIDAY, JANUARY 21, 1910.

ACTION to recover damages for injuries sustained by plaintiff while in the employment of defendant and alleged to have been caused by negligence of the defendant in al-

lowing the machinery with which plaintiff was working to be in a defective condition. There was a verdict for plaintiff, and from judgment thereon defendant appeals. —*Reversed.*

*Dawley & Wheeler* and *C. R. Sutherland,* for appellant.

*Joseph Mekota* and *Jamison & Smyth,* for appellee.

McCLAIN, J.—At the time he received the alleged injury on account of which he sues, the plaintiff was engaged in operating a blood press in defendant's packing plant. The press consisted of a platform resting on the floor of the room, on which the blood previously cooked and emptied from the kettles was shoveled into a canvas, which inclosed it while it was pressed by a platform on top, the object of the operation being to expel the liquid constituents of the mass so that the residue might be more conveniently used for manufacture into fertilizer. The pressure on top of the platform was exerted by a horizontal timber about sixteen feet long, twelve inches wide, and eight inches thick striking on its edge certain blocks adjusted on top of the upper platform so that when the pressure was being applied it would be nearly horizontal. This big timber extended east and west. At the east end was an upright wooden post fastened at the top to a beam in the ceiling of the room, and at the bottom fixed in the floor. This post was ratcheted on the east side, and the beam above referred to was connected to it by an iron clevis two or three feet long working into the ratchet so that the east end of the beam might be adjusted to the proper height. Near the west end of this beam, were three upright posts attached at the floor and ceiling between two of which the beam might be raised or lowered, and might be supported by an iron pin when the material

for pressing was being placed on the platform which was between the ratcheted post at the east and the three posts at the west. Between the other two posts was the drum of a windlass, around which passed a rope carried over a pulley in the ceiling and attached to the extreme western end of the beam. Below the beam at its west end was attached a barrel filled with stone and scrap iron, furnishing the weight which, when the beam was properly adjusted at the east end, caused pressure to be exerted upon the material to be pressed. The windlass was operated by a crank connected with a small cogwheel working into a larger cogwheel attached to the drum. The windlass was used to elevate the west end of the beam having the weight attached to it until the beam might be supported by the iron pin between the two posts when not in use; and, when the material to be pressed was properly adjusted upon the platform, the pin would be removed, and the beam would be slowly lowered by means of the windlass until it rested upon the pressing platform. Plaintiff's business was to operate the crank of the windlass. In raising the beam he would have the assistance of another, but in lowering it his own strength was sufficient to enable him, by holding back on the handle of the crank, to let it down slowly until it rested on the blocks on top of the pressing platform. While thus engaged in lowering the beam, there was a sudden jerk which wrenched the handle of the windlass out of his hands and caused it, after a quick revolution, to strike him on the back of his right hand, producing the injury complained of.

The negligence on the part of defendant relied on for plaintiff was in allowing the lower end of the east or ratcheted post to be loose or ineffectually secured, so that as the beam was lowered the east end was not firmly held in place by the post, but was allowed to move in such a way as to produce a jerk on the rope at the west end, which wrenched the handle of the windlass crank out of the

plaintiff's hands.   Defendant admitted plaintiff to have been in its employment when the injury referred to in the petition was received, but denied all other allegations of the petition, and alleged affirmatively that, if the machinery with which he was working was in defective condition, plaintiff was aware of that fact, and by continuing in the employment assumed the risk thereof.  There was a conflict in the evidence as to whether prior to the accident the lower end of the ratcheted post was loose in the floor, and as to whether the disability which plaintiff had testified to as resulting from the injury was real or feigned.

I.   Over defendant's objections, plaintiff was allowed to testify that about two weeks prior to the accident referred to he was slightly injured by the handle of the windlass being jerked out of his hands in substantially the same way as when the accident complained of occurred, and that he communicated a complaint to the foreman that the apparatus was out of repair, and was told afterward that it was all repaired and fixed up. Plaintiff was also allowed, over defendant's objections, to introduce testimony by two witnesses as to this prior accident, and as to the fastening of the post at the bottom by defendant's directions.   We think it was competent, in view of the allegation of defendant's answer that plaintiff had knowledge of the defective condition of the apparatus and assumed the risk thereof, for plaintiff to show the circumstances of a prior complaint and the assurance of the foreman that the defect complained of had been remedied.   After having such assurance from the foreman, it was not incumbent upon plaintiff to make an investigation to determine at his peril whether the fastening of the lower end of the post had been so secured as that it would resist the pressure thrown upon it by the downward motion of the beam when it first came to rest upon the blocks above the pressing platform so that it would not move

1. MASTER AND SERVANT: defective machinery: prior complaint: assumption of risk.

sidewise. The testimony of witnesses that the lower end of the post had been properly secured was not conclusive, and we think it was for the jury to say whether the previous defect, if they found a defect in the fastening to have existed, had been adequately remedied. We find no error in the rulings of the court as to the admission of the evidence.

II. To sustain plaintiff's recovery, we must find in the record some substantial evidence: First, that the lower end of the ratcheted post was loose, or would move at least to some extent, at the time of the accident to plaintiff, and that the defendant was negligent in allowing it to be in this condition; and, second, that this condition of the post caused the jerking of the rope with which the beam was being lowered by means of the windlass, resulting in plaintiff's losing his hold on the handle of the crank and being struck by it in its rapid revolution. In neither of these respects, as we think, is there sufficient evidence to support a verdict.

2. SAME: negligence: evidence.

Plaintiff testified that he did not know at any time during his employment that the lower end of the post was loose. He testified, first, that there was a cement floor about the lower end of the post; then, that there was still a stone floor at that place. On further interrogation, he testified that there was no floor, but only earth, and that the earth was wet so deep that he sank into it above his ankles. He is the only witness who testifies to any complaint made to the foreman or any assurance given by the foreman that the difficulty complained of had been repaired (and he is contradicted by his fellow workman, through whom he says the complaint was made, and the foreman who is said to have given him the assurance of repair); but he does not say he made any complaint about the condition of the post. He only claims that after being hurt the first time, about a week before the accident now

complained of, he told the man working with him to tell the boss to have it (apparently the windlass) repaired or fixed, and the reason assigned for making such complaint was that it hurt him over the hand. He says that when the foreman told him to come back there to work after he had been absent for three or four days, and just before the happening of the accident, he replied he would not go there to work, and that the foreman then said, "It was all repaired and fixed up," and that everything was "all right there." He testifies to previous fixing or repairing of the press, and says that on each occasion it worked for a few days, and then he would have trouble with it again; but he can not say what the repairs were in any instance, and he does not claim that he knew of any repairs being made about the end of the post. As workmen were in fact engaged in making changes in the ceiling of the room which necessitated the disconnection of the posts at the top temporarily, the rational explanation of plaintiff's testimony would be that the fixing to which he referred was the fastening of the post at the top so that the press could be put into operation. There is no contention that at the time of this accident the ratcheted post was not firmly fixed at the top.

A witness for plaintiff testified that on the day of the accident some planks had been driven down beside the ratcheted post, and there was no cement floor there; but he says the post went into the ground two feet, and he could not tell whether it was loose or not, and he further says that he never had any knowledge of its being loose.

Two carpenters, who had worked in the room removing timber supports of the ceiling and replacing them with iron supports, testified that the stone floor had been taken out, and that there was dirt and mud around the ratcheted post, and that it was loose so that the bottom of it would move around sideways until they drove planks

down beside. it and spiked them to it; but they did not
claim that it would move more than half an inch, and they
testified that after it was fixed it was perfectly firm and
secure.    One of these testified that they thus fixed this
post several times, but that each time it would remain firm
until some new change was made in the floor, when it
would be fastened again.

Now the overwhelming testimony for the defendant
is that the stone floor was never taken up, and that the
cement floor was laid upon the stone floor, and was fin-
ished more than a week before the accident of which plain-
tiff complains.    This cement floor was so laid as to firmly
inclose the post, and it is not claimed by anybody that,
if this cement floor was in fact finished up to the post,
there was any possibility of its afterwards moving or giv-
ing away.    Leaving out of account, however, the conflict
in testimony as to whether the cement floor was completed
prior to the accident, we find that there is no evidence
whatever that the ratcheted post was loose at the bottom
or would give under pressure after plaintiff returned to
his work a few days prior to the accident.    His own wit-
nesses say that after they put the planking down around
the post it was perfectly firm and secure, and there is
not a scintilla of evidence that it did in fact move when
the accident happened.

There is nothing but the vaguest surmise to support
the contention that a slight movement of the foot of the
ratcheted post would cause the beam to jerk as it was
lowered by the windlass.    The pressure at the post caused
by the lowering of the beam would necessarily be almost
directly upward, for the end of the beam next to the post
was prevented from rising as the pressure was applied to
the pressing platform only by the clevis which was caught
in one of the notches of the ratchet.    It is not conceivable
that, under these circumstances, a slight movement of the
foot of the ratcheted post sidewise, even if it was not firmly

fixed, would cause a jerk on the rope at the other end. The beam, while descending, was supported at the end where the weight was attached by the rope from the ceiling, and was restrained at the end next the ratcheted post by the clevis. Hanging in this manner, a slight sidewise movement of the upright post could not, we think, have caused any jerk on the rope.

The only rational explanation given in the testimony of the jerk to which plaintiff testified is that of his co-employee in charge of the adjusting of the clevis at the ratchet and of the blocks under the beam and upon the pressing platform, whose duty it also was to remove the pin under the western end of the beam before it was lowered, that after he had removed the pin, and while he was adjusting the clevis, it slipped up one notch in the ratchet. This would no doubt cause a jerking of the rope, but it is not contended that the ratchet was an improper appliance, and, if there was any fault in the slipping of the clevis, it was the fault of plaintiff's co-employees for which defendant would not be in any way responsible to plaintiff.

In the absence of any evidence that the ratchet post was in fact loose, or insufficiently secured at the bottom, and that, if it did in fact move sidewise, such movement caused the jerking of the rope, the jury was not justified in indulging a surmise that the post did in fact move, and that this movement did in fact cause the rope to jerk so that the plaintiff lost his hold upon the handle of the windlass crank.

We think the verdict of the jury was without any support in the evidence, and for that reason the judgment of the trial court is *reversed.*